Good morning, Your Honors. May it please the Court, James G. appearing for Mr. Mills. I'm known to the Attorney General as Kyle G., that's how I practice. But in this Court, I'm using the whole nut. I want to reserve two minutes. I also want to say at the outset, I recognize in these state habeas cases that there is definitely an issue of large rocks and steep hills and that the burden is not an easy one to satisfy, particularly since this is a case that was decided by the California Supreme Court. But nonetheless, I believe in this case and I'm asking the Court to give it its very careful attention. We've got this fellow who was definitely delusional based on mental illness. He was on the run from some perceived threat from gangsters in Merced. He fled to Contra Costa County in the middle of the night. He hears voices from radios. He's got a psychiatrist who testifies that he was operating at the time at a psychotic level. Mr. Furstenberg, who was on the train platform, I think captures it pretty well. He says his behavior was, quote, a little nuts. And he had this belief that the people at the train station, including the man that he shot, were there to kill him. There were these hit teams that were after him. And the fact of his mental illness was relevant, first, and less importantly, really given his age to the issue of premeditation and deliberation. A second-degree murder with a gun, he'd still be doing effectively life without parole. Much more importantly, it was relevant to the issue of imperfect self-defense, which under California law, once the evidence is presented, then it becomes the prosecution's burden beyond a reasonable doubt in relation to malice to show that he did not act in imperfect self-defense. And into the middle of this, they dropped this conclusive presumption that the jury was to conclusively presume that the defendant was legally sane at the time these events occurred. And the court, it's not the claim of error, but it's a relevant consideration. The trial court refused to define for the jury what was meant by the words legally sane, so the jury was left to decide for itself what those words meant And to borrow from the Patterson case, sane to a layman means rational. Sane to a layman means mentally sound. And in Patterson, the Ninth Circuit took a look at an instruction that was virtually identical, except that it did not include the word conclusively. And it found that giving the instruction that it included legally. It did not include legally or conclusively. Roberts, but legally would at least potentially alert the jury that we're not talking about conventional sanity, that you're just not to take it as a legal, I mean, you're not to get into the legal definition of sanity at this bifurcated stage. I guess I might put it to you generally, given that California has this bifurcated situation, what should the jury be instructed? I mean, this is what the system sets up as a way of helping this bifurcation. Do you have some other way it should be handled? Well, I think the way it should be handled is the way it's now being handled in California after Mr. Mill's decision is we do we just tell the jury these are the issues that you have to decide, and we do not muddy the waters with this conclusive presumption. They found as a matter of State law, that's not going to be part of our jurisprudence anymore. But I do understand the Court's the implication is that somehow a lay juror is going to look at legally sane and sane as being distinguishable concepts, but the fact that that potential exists. And when we were talking about here reasonable and, you know, how the jurors might reasonably interpret these things, we're not talking about the only possible interpretation or even perhaps the most rational interpretation under Estelle. Estelle does give some leeway into what reasonable interpretations juries might give to these instructions. But is it reasonable interpretation or reasonable likelihood after Boyd, after Boyd, or Boyd, however you pronounce it? Let me get to the right page. It's a reasonable likelihood of how they, all right. It's different than pre-Boyd. Right. Right. But at least under other California, under other U.S. Supreme Court cases, they do not treat reasonable likelihood as meaning substantial likelihood. So there is some limit on how far this rule goes. And just to look at the sum of the things that the California Supreme Court did that we consider to be reasons that the opinion should not bind this Court. Patterson was looking at a rebuttable presumption as to mental state. It deemed that indistinguishable as a practical matter from Francis. And in this case, we had the words conclusive thrown into the mix on mental state, which makes it even more compelling under Patterson. The California Supreme Court, in our view, misapplied Francis when it relied too heavily on other instructions to cure the problem. It applied the wrong standard of prejudice. It relied on Middleton, which has no application to presumption cases. This was how the California Supreme Court described the significance of mental illness in this case. His mental illness contributed to his unreasonable belief. I consider that an unreasonable interpretation of the facts. It was the source of this delusional belief that he was under mortal threat at the train station from virtually every man that he encountered there. And unless the Court has further questions, I've really come to the end of my notes that I was going to address. I have one question for you. The California Supreme Court did talk about harmless error in analyzing State law, not Federal law. Correct. Correct. The government, or the State in this case, does make a harmless error argument of some forth, and I'll be asking them about that as well. But from your position, your point, how would we review harmless error? Under what standard? Well, you'd have to review it under Brecht. And the concept of, I want to make sure I get my words more correct this time. Where am I? So whether this Court would have grave doubts about under that description of the Brecht standard. And it's your position that we would not apply ad vedeference to that because the State court did not apply harmless error to the Federal claims, only the State law claims. Correct. If they, under Watson, which is the California standard, or under the Constitution of California, I believe it was Hall. One of the cases we had that found that there had been error in a presumption in the State case, they said that it was unreasonable to apply the Watson standard to a Federal constitutional error. Two seconds. All right. Thank you. Okay. Thank you. Annette Winokur from the Attorney General's Office. May it please the Court. California Supreme Court opinion here clearly analyzed the due process claim under Boyd, Estelle, and Middleton. In doing so, its conclusion that there was no reasonable likelihood that the jury in this case applied the challenged instruction in an unconstitutional manner was not objectively unreasonable for the following reasons. The trial court gave 12 instructions that related to either murder, manslaughter, specific intent, the defendant's defense of imperfect self-defense, and those were in addition to this challenged instruction. The entire case, starting from the opening arguments through to the examination of the witnesses and the cross-examination by the defense counsel, all focused on the defendant's mental state that carried in through the closing argument where the defense attorney specifically argued the defendant's fear was totally unreasonable. That's the very reason why he's not insane. Given this argument, given the prosecutor's argument that the presumption of sanity was to be reserved for the following phase, the prosecutor stated this is really important to remember for this stage of the proceeding, this guilt phase that the defendant is presumed to be sane, the insanity issue will follow. The trial court apparently also informed the jury before trial began that there was going to be a separate phase. And the reason I say apparently is because it looks like after the verdict was rendered, after the guilt phase, the trial court said to the jury, as I explained to you when we first got together, there's a second phase to this, which will be the insanity phase. We don't have the trial court's exact words because the jury voir dire was not included in the reporter's transcript in this case. But given the fact that the trial court stated that after the verdict was rendered, the prosecutor's comment in closing and the fact that at least two of the instructions, including the challenged instruction, both refer to the guilt phase of this trial, this, all this, in addition to the fact that this jury was told that the defendant was to be presumed legally sane, warrants the conclusion that this jury understood that the sanity issue was the trial by both the prosecutor pretty much and the defense attorney was that the defendant's mental state affected his ability to decide whether he should be afraid under the imperfect self-defense, defense that he presented at trial. Is the use of the term legally sufficient to distinguish this case from Stark and Patterson? Well, that's a good starting point to distinguish it, but as long as you bring up Stark and Patterson, there are at least two or three, maybe even four other distinguishing factors between this case and both Stark and Patterson. In Patterson, you had a defendant who first argued that his mental illness prevented him from forming the specific intent to commit murder. As we stated in our briefs, the defendant here pretty much acknowledged that he had the specific intent to commit murder. He was just arguing that he was unreasonably afraid for his life, and that's why he shot at the victim. Patterson and — both Patterson and Stark, the defendants both claimed they didn't have the specific intent. In both those cases, or I should say in neither of those cases, did the — is there any evidence that trial court explained to the jury that there was a bifurcated proceeding and that the issue of sanity was to follow, or that this was a legal sense, that there was a definition, that this was different than the conventional lay-sense definition of sane? In Patterson, you also had a prosecutor who argued in closing not only that the jury should disregard the evidence of mental illness, but that the evidence that was presented of mental illness on the defendant's part was irrelevant. You also have a jury in Patterson when they — after they found the defendant guilty, they went on to the sanity phase and they hung on the issue as to whether the defendant was even sane at the time he committed the offense. As far as Stark, you also have the fact that the trial court, after the jury found the defendant guilty of first-degree murder, the trial court actually modified the verdict and found that there was insufficient evidence to support the premeditation and deliberation. So here you have none of these factors. What you have is a defendant who admitted that he had the specific intent to commit murder. And by all accounts, every instruction, every argument, cross-examination, direct examination of the witnesses pointed to the fact that this jury should consider the defendant's mental illness in deciding whether he was guilty of manslaughter under an imperfect self-defense theory as per the defense argument or — versus whether he was guilty of murder, first- or second-degree murder, under the prosecution's argument. So based on the arguments of counsel, based on the 12 instructions that were given to the jury in this case, it's our position that the California Supreme Court's application of Estelle, Boyd, and Middleton was not an unreasonable application of clearly established Supreme Court law. And unless there are any other questions, I would submit. I don't think so. Thank you. Very briefly, she talked about what the prosecutor argued at trial. It's significant the prosecutor really put his eggs in the basket of this instruction. He didn't call any alienist at trial. My recollection of Patterson was that really the critical issue there was premeditation and deliberation and not intent to kill. And the instruction in that case spoke of mental state, which is a very broad concept that certainly covers everything that's relevant to Mr. Mills's case. And as far as the finding, the subsequent finding that Mr. Mills was legally sane, under the California definition of legal sanity, that has no implications backward to what happened in the determination of guilt at this trial. And I have to concede that Mr. Mills definitely admitted that he was shooting that man and shooting him until he was no longer able to act. But I don't recall him ever saying using intent to kill or anything else. It was intent to make sure he was safe. So unless the Court has questions, thank you very much for your time. Thank you.
judges: Boggs, Paez, Owens